# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

S.B.,

     *Plaintiff*,

     v.

OXFORD HEALTH INSURANCE, INC.

     *Defendant*.

No. 3:17-cv-1485 (MPS)

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff S.B. ("Plaintiff") sued Defendant Oxford Health Insurance, Inc. ("Oxford") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, after Oxford denied Plaintiff coverage for residential mental health treatment under an employee benefit plan. The parties have filed cross motions for summary judgment. For the reasons set forth below, I find that Oxford's denial was arbitrary and capricious; consequently, Plaintiff's motion is GRANTED IN PART AND DENIED IN PART and Oxford's motion is DENIED.

## II. BACKGROUND

The following relevant facts are taken from the parties' Local Rule 56(a) Statements and the Administrative Record ("AR") and are undisputed unless otherwise indicated.

### A. The Plan

At all relevant times, Plaintiff S.B.—referred to by her initials because she was a minor during the relevant time period—was a covered beneficiary under the TechStyle Contract Fabrics Freedom PPO Plan (the "Plan"), which is an employee welfare benefit plan funded by a group policy of insurance issued by Oxford. (ECF No. 49-5 ("Defendant's 56(a)1 Statement") at ¶ 3; ECF No. 57 ("Plaintiff's 56(a)2 Statement") at ¶ 3; ECF No. 54 ("Defendant's 56(a)2 Statement") at ¶ 2.) The Plan provides benefits for "medically necessary" treatment. (ECF No. 48-5

1

("Plaintiff's 56(a)1 Statement") at ¶ 3; Defendant's 56(a)2 Statement at ¶ 3.)  Services are deemed

"medically necessary" under the Plan only if:

- They are clinically appropriate in terms of type, frequency, extent, site, and duration, and considered effective for Your illness, injury, or disease;
- They are required for the direct care and treatment or management of that condition;
- Your condition would be adversely affected if the services were not provided;
- They are provided in accordance with generally-accepted standards of medical practice;
- They are not primarily for the convenience of You, Your family, or Your Provider;
- They are not more costly than an alternative service or sequence of services, that is at least as likely to produce equivalent therapeutic or diagnostic results;
- When setting or place of service is part of the review, services that can be safely provided to You in a lower cost setting will not be Medically Necessary if they are performed in a higher cost setting. For example we will not provide coverage for an inpatient admission for surgery if the surgery could have been performed on an outpatient basis.

(AR 173.[1])  By itself, the fact that a provider has furnished, prescribed, ordered, recommended or

approved a service does not make it medically necessary for the purposes of the Plan.  (AR 173.)

The Plan further provides that Oxford "may base [its] decision on a review of:

- [the beneficiary's] medical records;
- [Oxford's[2]] medical policies and clinical guidelines;
- Medical opinions of a professional society, peer review committee or other groups of Physicians;
- Reports in peer-reviewed medical literature;
- Reports and guidelines published by nationally-recognized health care organizations that include supporting scientific data;
- Professional standards of safety and effectiveness, which are generally recognized in the United States for diagnosis, care, or treatment;
- The opinion of Health Care Professionals in the generally-recognized health specialty involved;
- The opinion of the attending Providers, which have credence but do not overrule contrary opinions.

---

[1] Citations to the administrative record refer to the Bates page number located in the bottom right hand corner of the page and labeled "UNITED."  The record is attached to both parties' summary judgment motions.  (*See* ECF No. 48-3; ECF No. 48-4; ECF No. 49-3; ECF 49-4.)

[2] The Plan defines "Us, We, Our" as "Oxford Health Insurance, Inc. and anyone to whom We legally delegate performance, on Our behalf, under this Certificate."  (AR 170.)  For the sake of brevity, when quoting excerpts from the Plan, I have rendered these pronouns as simply "Oxford."

(*Id.*)  Under the Plan, Oxford "review[s] health services to determine whether the services are or were Medically Necessary . . . ."  (AR 237.)  "All determination that services are not Medically Necessary will be made by: (1) licensed Physicians; or (2) licensed, certified, registered or credentialed Health Care Professionals who are in the same profession and same or similar specialty as the health care Provider who typically manages [the member's] medical condition or disease or provides the health care service under review."  (AR 237.)  Reviewers are not compensated or provided financial incentives for determining that services are not medically necessary.  (AR 237.)  According to the Plan, Oxford "may develop or adopt standards that describe in more detail when [it] will or will not make payments under [the] Certificate."  (AR 262.)  Such standards, however, cannot be "contrary to the descriptions in this Certificate."  (*Id.*)  The Plan further gives Oxford "all the powers necessary or appropriate to enable [it] to carry out [its] duties in connection with the administration of" the Plan.  (*Id.*)

United Behavioral Health Services, Inc. ("UBH") administers mental health benefits under the Plan.  (Plaintiff's 56(a)1 Statement at ¶ 2; Defendant's 56(a)2 Statement at ¶ 2.)  UBH's 2015 Level of Care Guidelines (the "UBH Guidelines") define "Residential Treatment Center" as "[a] sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient."  (AR 1852.)  The UBH Guidelines further provide that "[t]he course of treatment in a Residential Treatment Center is focused on addressing the 'why now' factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care."  (*Id.*)

The UBH Guidelines provide the following admissions criteria for residential treatment centers:

**1. Admission Criteria**

1.1. (See Common Criteria for All Levels of Care)

<u>AND</u>

1.2. The member is not in imminent or current risk of harm to self, others, and/or property.

<u>AND</u>

1.3. The "why now" factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors. Examples include:

1.3.1. Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered.

1.3.2. Psychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care.

(*Id.*)  The UBH Guidelines provide the following "Continued Service Criteria":

**2. Continued Service Criteria**

2.1. (See Common Criteria for All Levels of Care)

<u>AND</u>

2.2. Treatment is not primarily for the purpose of providing custodial care. Services are custodial when they are any of the following:

2.2.1. Non-health-related services, such as assistance in activities of daily living (examples include feeding, dressing, bathing, transferring and ambulating).

2.2.2. Health-related services that are provided for the primary purpose of meeting the personal needs of the patient or maintaining a level of function (even if the specific services are considered to be skilled services), as opposed to improving that function to an extent that might allow for a more independent existence.

2.2.3. Services that do not require continued administration by trained medical personnel in order to be delivered safely and effectively.

(AR 1853.)

Finally, the Plan provides that a member may internally appeal an adverse medical necessity determination.  (Defendant's 56(a)1 Statement at ¶ 21; Plaintiff's 56(a)2 Statement at ¶ 21.)  If the internal appeal process results in a final adverse medical necessity determination, a

4

member may appeal externally to an independent third party certified by the State to conduct such appeals. (AR 243.)

## B. Plaintiff's Admission to Avalon and Treatment History

On February 11, 2015, Plaintiff was admitted to residential treatment at Avalon Hills Eating Disorder Programs ("Avalon"), a facility that treats patients with eating disorders. (Plaintiff's 56(a)1 Statement at ¶ 6; Defendant's 56(a)2 Statement at ¶ 6.) At the time of her admission, Plaintiff was sixteen years old, her height was 61 inches, and her weight was 103.8 pounds.[3] (Defendant's 56(a)1 Statement at ¶ 25; Plaintiff's 56(a)2 Statement at ¶ 25; AR 526.) According to Avalon's intake assessment, Plaintiff's blood sugar was 52 mg/dL, her resting heart rate was 52 beats per minute, and her resting blood pressure was 100/60. (AR 522.)

According to Avalon's intake assessment, Plaintiff's eating disorder began in January 2013. (AR 519.) Plaintiff reported that she first started disliking her body in middle school. (AR 519.) When she was in the 8th grade, Plaintiff was told by her dance teacher that "she didn't have the body" to advance, which Plaintiff's parents felt was a devastating event for her. (AR 519.) More recently, Plaintiff reported having lost eight pounds in the last month, and Plaintiff's mother indicated that she had "tried to purge but couldn't make herself." (AR 526.) Avalon's intake assessment further indicates that Plaintiff suffered from several medical complications as a result of her eating disorder, including moderate malnutrition, insomnia, amenorrhea,[4] bradycardia

---

[3] On February 12, Plaintiff's weight appears to have dropped to 101.4 pounds. (Defendant's 56(a)1 Statement at ¶ 25; Plaintiff's 56(a)2 Statement at ¶ 25; AR 1816.)

[4] "Amenorrhea" refers to "the absence of menstruation. Women who have missed at least three menstrual periods in a row have amenorrhea." *Amenorrhea*, Mayo Clinic (July 25, 2019), https://www.mayoclinic.org/diseases-conditions/amenorrhea/symptoms-causes/syc-20369299. According to the intake assessment, Plaintiff had not had a menstrual period since June 2013.

sinus,[5] and constipation.  Avalon diagnosed Plaintiff with anorexia nervosa (restricting subtype) and generalized anxiety disorder.  (AR 522.)  According to the most recent Diagnostic and Statistical Manual of Mental Disorders (DSM-5), anorexia nervosa is characterized by three essential features: (A) "Restriction of energy intake . . . leading to significantly low body weight"; (B) "Intense fear of gaining weight or of becoming fat, or persistent behavior that interferes with weight gain, even though at a significantly low weight"; and (C) "Disturbance in the way in which one's body weight or shape is experienced, undue influence of body weight or shape on self-evaluation, or persistent lack of recognition of the seriousness of the current low body weight." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 338-39 (5th ed. 2013).

According to her intake assessment, Plaintiff had undergone substantial treatment for her eating disorder prior to her admission at Avalon.  From September 2013 through April 2014, Plaintiff underwent outpatient treatment, including weekly sessions with a therapist, weekly sessions with a nutritionist, and visits to a specialist every three weeks.  (AR 526.)  In April of 2014, she was treated at the intensive outpatient level of care for one week, followed by sixty days at the residential level of care (April-June 2014), another month of intensive outpatient care (July 2014), another 40 days in residential care (July-August 2014), and another 6 weeks of intensive outpatient care (August-September 2014).  (AR 526.)  The intake assessment also indicates that Plaintiff's mother suffers from a binge-eating disorder.  (AR 525-26.)

---

[5] "Bradycardia is a slower than normal heart rate.  The hearts of adults at rest usually beat between 60 and 100 times a minute."  *Bradycardia*, Mayo Clinic (Aug. 23, 2017), https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474. According to the intake assessment, Plaintiff's pulse at rest was 52 beats per minute.

## C. UBH's Initial Denial and Subsequent Reversal

UBH initially determined that coverage under the Plan was not available for Plaintiff's residential treatment at Avalon Hills from February 11, 2015 forward on the ground that such treatment was not medically necessary. (Defendant's 56(a)1 Statement at ¶ 27; Plaintiff's 56(a)2 Statement at ¶ 27.)   On February 16, 2015, Avalon submitted an urgent appeal request. (Defendant's 56(a)1 Statement at ¶ 28; Plaintiff's 56(a)2 Statement at ¶ 28.)  Dr. Theodore Allchin of UBH, a Board Certified Child, Adolescent and Adult Psychiatrist, conducted a peer-to-peer review with Dr. Kendal Pritchard of Avalon.  (Defendant's 56(a)1 Statement at ¶ 28; Plaintiff's 56(a)2 Statement at ¶ 28.)  According to UBH's documentation from the call, Dr. Pritchard of Avalon reported that Plaintiff was "88% of her ideal body weight."  (AR 1823.)  Avalon further reported that Plaintiff was "initially drinking only supplements but [Avalon staff] are slowly adding and she is accepting some solid food.  She is having orthostatic blood pressure changes with symptoms[—]her blood pressure is going from 96/56 to 76/58.  She has constipation.  [S]he also has temporal muscle wasting."  (*Id.*)  Avalon also felt that "therapeutically it is perhaps better that she is away from her mother who has her own eating disorder issues."  (*Id.*)  Avalon reported that Plaintiff's "initial glucose was in the 50s due to lack of eating."  (*Id.*)  Dr. Allchin of UBH concluded that residential treatment was medically necessary, "based on clinical information provided regarding orthostatic changes, limited meal participation[, and] low body weight."  (*Id.*)  Dr. Allchin authorized residential treatment benefits from February 11-19, with a required update on February 19.  (*Id.*)

## D. UBH's February 19 and February 23 Approvals for Additional Residential Treatment

On February 19, 2015, Avalon requested overage for another week and, according to UBH's records, reported that Plaintiff was on a 1500 calorie meal plan and was getting her blood

sugar checked four times per day. (Defendant's 56(a)1 Statement at ¶ 29; Plaintiff's 56(a)2 Statement at ¶ 29; AR 1825.) Avalon reported that Plaintiff "minimizes everything" and is "in a lot of denial about her [eating disorder], thinks everything is fine." (*Id.*) Avalon reported that Plaintiff's current weight was 103.6 pounds and that her target weight was 117 pounds. (*Id.*) Avalon reported that Plaintiff continued to refuse food at times, and on one occasion sat at the table for three hours refusing her supplement. (*Id.*) Avalon reported that Plaintiff "is eating at a slow pace, micro bites and cutting, watching others, inappropriate utensil use," and that she was "fearful of being fat or over weight." (AR 1826.) Avalon also reported "body checking, poor body image, a lot of leg shaking and rocking and unnecessary standing or pacing." (*Id.*) Avalon reported that Plaintiff "went to an eat out challenge at Burger King and had a very hard time with this." (*Id.*) Based on these reports, Dr. Allchin of UBH authorized an additional four days "for some further stabilization." (AR 1826-27.) Dr. Allchin noted, however, that he "does not feel [Plaintiff] will meet criteria to remain at [Avalon] for another [fourteen pounds]"—that is, until she reached Avalon's target weight of 117 pounds. (AR 1827.)

On February 23, 2015, Avalon requested coverage for another week and reported to UBH that Plaintiff's current weight was 104.4 pounds, well short of Avalon's target weight of 117 pounds. (Defendant's 56(a)1 Statement at ¶ 30; Plaintiff's 56(a)2 Statement at ¶ 30; AR 1828.) Avalon reported that Plaintiff was "refusing at time and supplementing at times, slow pace, small bites, not rotating foods, pick[ing] through things and pick[ing] things out." (AR 1828.) Avalon reported "excessive leg shaking and trips to burn calories" and that Plaintiff would "not even relax in a chair, sitting with her back arched in hopes of burning calories that way." (*Id.*) Avalon reported that Plaintiff was "caught running up and down the stairs and needing redirection," to which she "has not been receptive." (*Id.*) Avalon reported "frequent body checking" and

"minimizing of her issues," and that Plaintiff continued to argue that "she has never had any physical issues due to her [eating disorder] so she does not need to change it." (*Id.*) Based on this information, Dr. Allchin authorized continued residential treatment at Avalon for another three days, through February 26, 2015, "for some further stabilization and an update on what is being done to manage the Orthostatic.' (AR 1829.) But Dr. Allchin indicated that "he does not feel the [member] will meet criteria to remain at [Avalon] for another 13 [pounds]." (*Id.*)

## E. UBH's March 2 Initial Adverse Benefit Determination

On February 26, 2015, Avalon requested coverage for "another 3-4 weeks." (Defendant's 56(a)1 Statement at ¶ 31; Plaintiff's 56(a)2 Statement at ¶ 31.) According to UBH's notes, Avalon reported that Plaintiff was now on a 2,200 calories per day meal plan and weighed 106.2 pounds. (AR 1831.) Avalon reported that Plaintiff "minimizes everything" and that she was "annoyed that she is at this program," and reported "lik[ing] her previous facility better." (*Id.*) Avalon believed "this was because [the previous facility] let [her] get away with more of her food rituals." (*Id.*) Avalon reported that Plaintiff "did go on a skiing outing" but was "mad that she needed to eat a candy bar and have extra Gatorade in order to be able to go." (*Id.*) Avalon reported that Plaintiff was taking "about 30 [minutes] to finish a meal and require[d] constant redirection" and that, upon redirection, she "gets very mad and yells at staff." (*Id.*) Avalon reported that Plaintiff needed "lots of redirection" for "excessive leg shaking and extra trips to burn calories" and for "trying to do an ab work out." (*Id.*) Avalon also reported that Plaintiff took "small slow bites, watching others, refuses dessert and needed supplement, [and] needs constant reminders to complete her meals and t[o] not wipe or eliminate parts of the food." (*Id.*)

According to UBH's records, Dr. Allchin felt Plaintiff had "made enough progress to be treated in a [partial hospitalization program]," rather than residential treatment. (AR 1832.) A

peer review was arranged with Dr. Lee Becker of UBH and providers at Avalon Hills. (*Id.*) The peer review took place the next day, February 27, 2015. UBH's records indicate that Avalon reported, in addition to what it had reported on February 26, that Plaintiff was "attending to her [activities of daily living]," that she did not report any dizziness, that "[s]he is attending all programming but motivation is questionable," that her most recent weight was 105.6 pounds and her target weight for discharge was 115 pounds. (AR 1833.) UBH's notes also indicate that Plaintiff was "completing her meal plan." (*Id.*) Avalon also reported that Plaintiff "still has bradycardia in the mornings and some orthostatic changes but no significant orthostatic blood pressure changes." (*Id.*) Avalon clarified that, although Plaintiff "did go on the ski outing," she "did not participate" and was out for approximately two hours. (*Id.*) She also attended an "outing outside the facility with peers, who did a [Z]umba class but [Plaintiff] was just walking." (*Id.*)

According to Avalon's notes from the February 27 peer review call, Avalon reported that Plaintiff had had a recent weight loss and that her heart rate goes from 40 to 50 in the morning. (AR 494.) Avalon reported that both Plaintiff and her parents are resistant to psychiatric medication, but that Avalon would have preferred to start her on an SSRI.[6] (*Id.*) Avalon described her ski trip outing as "basically going for a ride as we do not feel she is medically ready for the activity." (*Id.*) Avalon reported that Plaintiff is "dizzy at times," "minimizes her symptoms," and has not "given herself permission to eat" yet. (*Id.*) Dr. Boghosian of Avalon indicated that Avalon's long-term goal "is to get her at a place where she is not bouncing in and out of treatment." (*Id.*) Avalon reported that Plaintiff is "going through the motions" and "at times is sleeping during

---

[6] "SSRI" stands for "selective serotonin reuptake inhibitor." SSRIs are the most commonly prescribed antidepressants. *Selective Serotonin Reuptake Inhibitors (SSRIs)*, Mayo Clinic (Sept. 17, 2019), https://www.mayoclinic.org/diseases-conditions/depression/in-depth/ssris/art-20044825.

groups and not fully engaged." (*Id.*)  Dr. Boghosian opined that Plaintiff "would relapse as soon as she went home" because "she is not able to feed herself without the structure of this program." (*Id.*)  Avalon noted that Plaintiff's "vitals seem to be poor due to malnutrition and we expect her vitals will improve in time." (*Id.*)  Avalon's notes indicate that Dr. Becker explained that he nonetheless felt that Plaintiff's treatment could continue at partial hospitalization program level of care. (*Id.*)

On March 2, 2015, UBH issued a letter from Dr. Becker addressed to Plaintiff's parents, indicating that residential treatment from February 27, 2015 forward would not be covered by the Plan. (AR 288.)  The letter explained:

> The reason for my decision is based on lack of medical necessity per UBH Level of Care Guidelines for Mental Health Residential Treatment Care. Your child is doing better. She has been able to work with her treatment team by attending programming and following her meal plan. Weight gain has occurred.  She is able to do her daily tasks. She is not acting on every thought or feeling. She does not appear to have medical or mental health concerns needing 24-hour care. She has been able to attend several outside outings. It appears treatment could continue in another setting. Mental Health Partial Hospitalization Program would be authorized instead.

(AR 288.)

## F.  Avalon's March 2 Appeal and UBH's March 4 Denial

On March 2, 2015, Avalon submitted an urgent appeal of UBH's initial adverse benefit determination.  (Defendant's 56(a)1 Statement at ¶ 35; Plaintiff's 56(a)2 Statement at ¶ 35.)  On March 4, 2015, Dr. Eugene Kwon of UBH conducted a peer-to-peer review with Dr. Kendal Pritchard of Avalon.  According to UBH's records, Avalon reported that Plaintiff was able to "safely attend a ski outing and ate snacks"; that Plaintiff's "family dynamics are difficult in that [her] mother also has an eating disorder and there appears to be a bit of competition between them"; that Plaintiff "continues to minimize her symptoms and issues and remains upset that she is in

treatment"; that Plaintiff has a "pre-contemplative mindset and intermittently refuses food"; and that "it would be helpful to monitor [her] for anxiety and her eating disorder symptoms." (AR 1834.) UBH's documentation further notes that Plaintiff is "medically stable though she is orthostatic at times"; that there are "no significant mood or behavioral issues"; and that there is no "[suicidal ideation]/[homicidal ideation]/[auditory verbal hallucinations]." (AR 1834.)

According to Avalon's record of the March 4 call, Dr. Pritchard of Avalon explained to Dr. Kwon that Plaintiff was "actively attempting to use eating disorder related behaviors at the table, even in the presence of staff members." (AR 492.) She was "refusing to eat certain meals, or fails to finish a meal or snack in time, resulting in the need to replace with a liquid supplement." (*Id.*) Dr. Pritchard explained that Plaintiff was in a "pre-contemplative mindset toward recovery, and doesn't think that there is a problem and that everyone else is 'blowing it out of proportion.'" (*Id.*) Dr. Pritchard opined that, given what Avalon was seeing, "it is safe to say that if she were to return home to a lower level of care, she would continue her previous pattern of restrictive behaviors."[7] (*Id.*) Dr. Pritchard also discussed the dynamic between Plaintiff and her mother and opined that "having distance between [Plaintiff] and her mother is important to allow them both to heal and do their own work before trying to work together in a healthy way." (*Id.*) Dr. Pritchard also cited American Psychiatric Association (APA) criteria, indicating that Plaintiff met multiple criteria, even though she only had to meet one to qualify for residential treatment. (*Id.*) According to Avalon's notes, Dr. Kwon stated that the risk of relapse and the Plaintiff's home environment were both "troubling," but that 24/7 monitoring was not required, residential treatment was not medically necessary, and Plaintiff could continue treatment at a lower level of care. (AR 492-93.)

---

[7] "Restrictive" behavior refers to behaviors related to the restriction of energy intake, one of the essential features of anorexia according to the DSM Manual. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 338-39 (5th ed. 2013).

In a later dated March 4, 2015 by Dr. Kwon, UBH denied the March 2 appeal. (AR 1395.)

Dr. Kwon provided the following explanation for the denial of coverage:

> Your child's treatment does not meet medical necessity criteria and the adverse benefit determination is [sic] issued 02/27/2015 forward is upheld. I based this decision on clinical information provided and UBH Level of Care Guidelines for Mental Health Residential Treatment Center. The care is not medically necessary. Your child is able to work on her recovery. Your child seems to be working well with others and on her recovery goals so that residential care is no longer needed. Your child does not appear to be at risk of harming yourself or others. Your child does not have serious medical problems needing 24-hour care. The care your child is getting can happen in a less restrictive program. It does not look like your child would need inpatient care if she were not in the residential program. Your child does not appear to have significant mood symptoms. No significant behavioral disturbances are reported. Your care can occur in a less restrictive mental health partial hospitalization program which is available in your area.

(AR 1395-96.) The letter also advised both Plaintiff and her provider of their additional appeal

rights. (AR 1396-1401.)

## G.  Plaintiff's April 16 Second Level Appeal and UBH's August 6 Denial

On or about April 16, 2015, Plaintiff's counsel submitted Plaintiff's second level appeal of

UBH's denial of coverage for Plaintiff's residential treatment level of care at Avalon from

February 27, 2015 onward. (Defendant's Rule 56(a)1 Statement at ¶ 39; Plaintiff's Rule 56(a)2

Statement at ¶ 39.) The second level appeal included treatment records from Avalon and several

references, including Guideline Watch: Practice Guideline for the Treatment of Patients with

Eating Disorders (AR 565-70), American Psychiatric Association Practice Guideline for the

Treatment of Patients with Eating Disorders ("APA Guidelines") (AR 571-698), and 2012

Academy of Eating Disorders Critical Points for Early Recognition and Medical Risk Management

in the Care of Individuals with Eating Disorders (AR 699-708). (Defendant's Rule 56(a)1

Statement at ¶ 40; Plaintiff's Rule 56(a)2 Statement at ¶ 40.)

The APA Guidelines submitted by Plaintiff include detailed guidelines regarding the appropriate level of care for patients with eating disorders. Unlike the UBH Guidelines, which are intended to apply to all mental illnesses, the APA Guidelines specifically address the treatment of eating disorders. The APA Guidelines set forth ten criteria and provide that "a given level of care should be considered for patients who meet *one or more* criteria under a particular level." (AR 609 (emphasis added).) The APA criteria for residential treatment and partial hospitalization— the two levels of care at issue here—are as follows:

- *Medical status*. Residential treatment is indicated only if a patient is "medically stable to the extent that intravenous fluids, nasogastric tube feedings, or multiple daily laboratory tests are not needed." Partial Hospitalization is indicated if the medical monitoring provided at higher levels of care is not required. (AR 607.)

- *Suicidality*. "If suicidality is present, inpatient monitoring and treatment may be needed depending on the estimated level of risk." (*Id.*)

- *Weight as percentage of healthy body weight*. Residential treatment is "generally" indicated at less than 85%. Partial hospitalization is "generally" indicated at greater than 80%. (*Id.*) "[P]atients should not be automatically discharged just because they have achieved a certain weight level unless all other factors are appropriately considered." (AR 609.)

- *Motivation to recover*. This includes "cooperativeness, insight, and ability to control obsessive thoughts." Indications for residential treatment include "poor-to-fair motivation"; "preoccup[ation] with intrusive repetitive thoughts 4-6 hours a day"; and "cooperative with highly structured treatment." Indications for partial hospitalization include "partial motivation"; "cooperative"; and "preccup[ation] with intrusive repetitive thoughts >3 hours/day." (AR 608.)

- *Co-occurring disorders*. These can include substance abuse, depression, and anxiety. For both partial hospitalization and residential treatment, the "[p]resence of comorbid condition[s] may influence the choice of level of care." (AR 608.)

- *Structure needed for eating/gaining weight*. Indications for residential treatment include the need for "supervision at all meals or [the patient] will restrict eating." Indications for partial hospitalization is the need for "some structure to gain weight." (*Id.*)

- *Ability to control compulsive exercising*. For both residential treatment and partial hospitalization, indications include the requirement for "some degree of external structure beyond self-control . . . to prevent patient from compulsive exercising." But the guidelines note that this is "rarely a sole indication for increasing the level of care." (*Id.*)

14

- *Purging behavior.*  Residential treatment, as opposed to inpatient treatment, is indicated if a patient "can ask for and use support from others or use cognitive and behavioral skills to inhibit purging."  If incidents of purging can be "greatly reduced" in an "unstructured setting," lower levels of care are indicated.  (*Id.*)

- *Environment stress.*  Residential treatment or inpatient hospitalization is indicated if a patient is "unable to receive structured treatment [at] home" due to "severe family conflict or problems or absence of family."  Partial hospitalization is indicated if "others [are] able to provide at least limited support and structure." (AR 609.)

- *Geographic Availability.*  Residential treatment or inpatient hospitalization are indicated if treatment programs are too distant for the patient to participate from home.  (*Id.*)

According to the APA Guidelines, "[i]n determining a patient's initial level of care or suitability for change to a different level of care, expert consensus indicates that it is important to consider a patient's overall clinical and social picture rather than simply rely on weight criteria." (AR 606.)  The APA Guidelines further provide that

> weight level per se should never be used as the sole criterion for discharge from inpatient care. Patients need to both gain healthy body weight and learn to maintain that weight prior to discharge; patients who reach a healthy body weight but are discharged before this learning occurs are likely to immediately decrease their caloric intake to excessively low levels that are often insufficient to sustain their healthy body weight.

(*Id.*)

The April 16 letter submitted in support of Plaintiff's second level appeal stated that, based on the documents enclosed with the letter, including the APA Guidelines, UBH's initial adverse benefit determination should be overturned.  (Defendant's Rule 56(a)1 Statement at ¶¶ 39-40; Plaintiff's Rule 56(a)2 Statement at ¶¶ 39-40.)  The letter did not further elaborate on why UBH's initial adverse benefit determination should be overturned.  (Defendant's Rule 56(a)1 Statement at ¶ 40; Plaintiff's Rule 56(a)2 Statement at ¶ 40.)

On May 17, 2015, UBH acknowledged receipt of Plaintiff's second-level appeal and requested a signed authorization from Plaintiff permitting UBH to communicate with Plaintiff's attorney. (Plaintiff's 56a(1) Statement at ¶ 52; Defendant's 56a(2) Statement at ¶ 52.) On June 15, 2015, Plaintiff provided the signed authorization to UBH. (Plaintiff's 56a(1) Statement at ¶ 53; Defendant's 56a(2) Statement at ¶ 53.)

On August 5, 2015, Dr. Kenneth Fischer of UBH reviewed Plaintiff's April 16 second level appeal letter, along with Plaintiff's medical records and other submissions. (Defendant's Rule 56(a)1 Statement at ¶ 42; Plaintiff's Rule 56(a)2 Statement at ¶ 42.) In a letter dated August 6, 2015, Dr. Fischer advised Plaintiff of his decision to uphold the adverse benefit determination on second level appeal. (Defendant's Rule 56(a)1 Statement at ¶ 43; Plaintiff's Rule 56(a)2 Statement at ¶ 43.) Dr. Fischer explained the decision as follows:

> Based on the Optum[8] Level of Care Guideline for the Mental Health Residential Treatment Care Level of Care, it is my determination that no authorization can be provided from 02/27/2015 forward. Your daughter was admitted for treatment of her eating disorder. After reviewing the available information, it is noted she had made progress and that her condition no longer met Guidelines for further coverage of treatment in this setting. She could keep herself safe. She was not acting on every thought, urge or feeling. She worked well with others on her recovery goals and in daily activities. She attended outings. Weight gain occurred. She had no medical or mental health issues needing ongoing 24 hour care. She could have continued care in the Mental Health Partial Hospital Program setting.

(AR 711.)

## H. Procedural Background

According to Plaintiff, neither Plaintiff, nor her parents, nor Avalon ever received the August 6, 2015 letter. (ECF No. 41-4 at ¶ 2.) Plaintiff was not discharged from Avalon until November 24, 2015—approximately nine months after UBH denied coverage for any further

---

[8] The UBH Guidelines are also referred to as the "Optum" guidelines. (*See* AR 1852.)

residential treatment. (Plaintiff's 56(a)1 Statement at ¶ 56.) On March 9, 2016, apparently unaware that UBH had denied Plaintiff's second-level appeal the previous year, Plaintiff's attorney submitted additional materials in support of Plaintiff's appeal, including records concerning the remainder of Plaintiff's treatment at Avalon. (Plaintiff's 56(a)1 Statement at ¶ 57.) Plaintiff commenced the present action by filing a Complaint on September 5, 2017. (ECF No. 1.) Plaintiff, a minor at the time of the relevant events, later filed an Amended Complaint (ECF No. 18) to refer to herself by her initials rather than the pseudonym "Jane Doe." (ECF No. 18.) The Amended Complaint seeks relief against Oxford for the improper denial of benefits, including the payment of health insurance benefits due to Plaintiff under the Plan, and equitable relief under 29 U.S.C. § 1132(a)(1)(B). Plaintiff also seeks the payment of costs and attorneys' fees under 29 U.S.C. § 1132(g). Plaintiff filed a motion for remand (ECF No. 41), which the Court denied (ECF No. 61). The parties also filed the present cross-motions for summary judgment. (ECF No. 48; ECF No. 49.)

## III. LEGAL STANDARD

### A. Summary Judgment Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* (quotation marks omitted). On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). In this case, both sides have moved for summary judgment, and while each disputes a few of the other's characterizations of the facts, neither contends that there is a genuine issue for trial.

## B. ERISA Standard of Review

When an ERISA plan participant challenges a denial of benefits, the proper standard of review is de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[W]here the plan grants the administrator discretionary authority to determine eligibility [for] benefits, a deferential standard of review is appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). Under a deferential standard, a court may not reverse the administrator's conclusion unless it is arbitrary and capricious. *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995).

"The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'" *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (*quoting Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995)). In resolving the question of a plan's grant of such discretion, "[a]mbiguities are construed in favor of the plan beneficiary." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008).

> A reservation of discretion need not actually use the words "discretion" or "deference" to be effective, but it must be clear. Examples of such clear language include authorization to "resolve all disputes and ambiguities," or make benefits determinations "in our judgment." In general, language that establishes an

objective standard does not reserve discretion, while language that establishes a subjective standard does.

*Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005) (quoting *Kinstler*, 181 F.3d at 251). A Plan may confer discretionary authority on the administrator to make some decisions but not others. *See, e.g.*, *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (Plan language "grants Oxford discretionary authority as to determinations of what is 'Medically Necessary,' but does not afford Oxford broader discretion to construe other Plan terms.").

The Plan at issue here provides that "We review health services to determine whether the services are or were Medically Necessary . . ." and that "We have developed guidelines and protocols to assist Us in this process." (AR 237.) Elsewhere, the Plan elaborates on Oxford's right to "develop guidelines and administrative rules":

> **Right to Develop Guidelines and Administrative Rules.** We may develop or adopt standards that describe in more detail when We will or will not make payments under this Certificate. Examples of the use of the standards are to determine whether Hospital inpatient care was Medically Necessary; surgery was Medically Necessary to treat Your illness or injury; or certain services are skilled care. Those standards will not be contrary to the descriptions in this Certificate . . . . We may also develop administrative rules pertaining to enrollment and other administrative matters. We shall have all the powers necessary or appropriate to enable Us to carry out Our duties in connection with the administration of this Certificate.

(AR 262.) The Second Circuit has found similar language to "convey[] sufficient discretion to an administrator to require courts' 'arbitrary and capricious' rather than *de novo* review of its actions." *Krauss*, 517 F.3d at 623. In *Krauss*, the plan provided that Oxford "may adopt reasonable policies, procedures, rules, and interpretations to promote the orderly and efficient administration of this Certificate." 517 F.3d at 622. The *Krauss* Court explained that the language was "akin to authority to 'resolve all disputes and ambiguities relating to the interpretation' of a benefits plan, language that we have previously characterized as sufficient to trigger arbitrary and capricious, rather than

*de novo*, review." *Id.* at 623 (citing *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan*, 76 F.3d 462, 466 (2d Cir. 1996)). The language in the plan at issue here does not meaningfully differ from the language in *Krauss*. I thus find that the language confers discretionary authority, necessitating review by this Court under an arbitrary and capricious standard. While it is true that ambiguities as to whether discretionary authority exists are resolved in favor of the beneficiary, *Krauss*, 517 F.3d at 622, the language here is as clear as the language the Second Circuit deemed adequate in *Krauss*, which is binding authority upon this Court. *See also Benjamin v. Oxford Health Insurance, Inc.*, 2018 WL 3489588, at *6-7 (D. Conn. July 19, 2018) (finding that language nearly identical to the language at issue here conferred discretionary authority on Oxford under *Krauss*).

Plaintiff argues that even if the Plan granted Oxford discretionary authority, UBH, and not Oxford, made the benefit determination, and there is no indication that the Plan gives UBH discretionary authority. (ECF No. 48-1 at 11; ECF No. 56 at 9-10; ECF No. 60 at 4-5.) Under ERISA, a plan may provide for procedures "for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan." 29 U.S.C. § 1105(c)(1). Here, the plain language of the Plan clearly contemplates the delegation of authority to third parties: "Us, We, Our" is defined to include not only Oxford Health Insurance, Inc., but also "anyone to whom We legally delegate performance, on Our behalf, under this Certificate." (AR 170.) In turn, these pronouns, and not "Oxford," are used throughout the Plan. (*See, e.g.*, AR at 262 ("*We* may develop or adopt standards that describe in more detail when *We* will or will not make payments under this Certificate." (emphasis added)).) Plan participants were thus on notice that Oxford could delegate its authority under the Plan to third parties. Plaintiff's reliance on *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005), (ECF No. 60 at 4 n.2) is

misplaced. There, the Second Circuit held, in the alternative, that Prudential had not exercised any discretion because it had not substantially complied with a regulatory deadline and thus the claim was "deemed denied," on the principle that "inaction is not a valid exercise of discretion and leaves the court without any decision or application of expertise to which to defer." *Id. Nichols* does not purport to address the delegation of discretionary authority.

Whether a party has discretionary authority under the terms of a plan is a fact-specific inquiry, and the non-binding authority Plaintiff cites is all readily distinguishable. For example, Plaintiff cites *McDonnell v. First Unum Life Ins. Co.*, but in that case, there was no language in the plan indicating that discretionary authority could be delegated to third parties. 2013 WL 3975941, at *10-11 (S.D.N.Y. Aug. 5, 2013) (rejecting Fiduciary's argument that it had "*inherent* power to delegate its discretionary authority to a third party" (emphasis added)). Here, all of the language establishing discretionary authority refers to "We," "Us," and "Our," which is defined to include parties to whom Oxford "legally delegate[s] performance." In fact, most of the non-binding precedents Plaintiff cites involve Plan documents that do not contain any language purporting to confer discretionary authority on delegates at all. *See, e.g.*, *Rodriguez-Lopez v. Triple-S Vida, Inc.*, 850 F.3d 14, 21-23 (1st Cir. 2017). Plaintiff also cites *Shane v. Albersons, Inc.* There, the Plan language gave the "Trustees" the power to "delegate to the Contract Administrator and Employees of the Employer such powers and duties as the Trustee shall determine," but the Court found that a third party, and not the trustees, had made the delegation, thus violating the terms of the Plan. 504 F.3d 1166, 1171-72 (9th Cir. 2007) (emphasis added). Similarly, in *Rubio v. Chock Full O'Nuts Corp.*, also cited by the Plaintiff, the plan language conferred discretionary authority on the Board of Directors or a committee appointed by the Board, but did not contemplate any further delegation. 254 F. Supp. 2d 413, 421-22 (S.D.N.Y. 2003). The Court thus held that a

subcommittee appointed by a committee appointed by the Board did not have discretionary authority under the plan. *Id.* Here, by contrast, there is no allegation that the party making the delegation was not the party authorized to do so under the terms of the Plan. In short, the Plan confers discretionary authority not only on Oxford, but also on anyone to whom Oxford "legally delegate[s] performance," including UBH.

Under arbitrary and capricious review, a district court may overturn an administrator's decision to deny ERISA benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law. This scope of review is narrow; thus [the Court] is not free to substitute [its] own judgment for that of the insurer as if [it] were considering the issue of eligibility anew." *Gaud–Figueroa v. Metro. Life Ins. Co.*, 771 F.Supp.2d 207, 215 (D. Conn. 2011) (quoting *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009)) (internal quotation marks omitted). "Substantial evidence 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla but less than a preponderance.'" *Id.* (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). Still, even this deferential standard of review is more than a "perfunctory review of the factual record"; the review "must include a 'searching and careful' determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." *Magee v. Metro. Life Ins. Co.*, 632 F.Supp.2d 308, 317 (S.D.N.Y. 2009) (quoting *Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.*, 862 F. Supp. 783, 789 (E.D.N.Y. 1994)). The Court must moreover determine "whether the decision was based on a consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). "In determining whether relevant factors were considered and substantial evidence relied upon in an ERISA eligibility determination, courts are limited to the reasons given

at the time of the denial." *Diamond v. Reliance Standard Life Ins.*, 672 F.Supp.2d 530, 535 (S.D.N.Y. 2009) (internal quotation marks omitted).

## V. DISCUSSION

### A. Oxford's Denial of Coverage Was Arbitrary and Capricious

For the reasons that follow, I find that Oxford's denial of coverage for residential treatment of Plaintiff's eating disorder fails to satisfy even the deferential standard of review applicable here.

### 1. Oxford's Reliance on the UBH Guidelines

In each of the three letters denying coverage of Plaintiff's residential treatment after February 26, UBH states that it is applying the UBH Guidelines, described in detail in Section II.A above. (AR 288, 1395, 711.) Plaintiff argues that UBH exceeded its authority under the Plan by applying UBH's Guidelines rather than the Plan's definition of "medical necessity." ECF No. 48-1 at 14. As an initial matter, the Plan expressly provides that Oxford "may develop or adopt standards that describe in more detail when We will or will not make payments," including standards governing medical necessity determinations. (AR 262.) Elsewhere, the Plan provides that Oxford has "Developed guidelines and protocols to assist Us in" determining whether services are medically necessary. (AR 237.) The development and application of guidelines thus does not, in and of itself, violate the terms of the Plan.

However, Oxford's discretion to adopt guidelines is also explicitly cabined by the Plan. The Plan provides that any standards "will not be contrary to the descriptions in [the Plan]." (AR 262.) Moreover, the Plan provides for the development of standards that "describe *in more detail* when We will or will not make payments." (*Id.* (emphasis added).) This language indicates that the standards are intended to elaborate on the eligibility requirements in the Plan, such as the definition of medical necessity—not transform them. Determining whether Oxford's conduct was

within its authority under the Plan thus requires a closer examination of both the UBH Guidelines and the Plan's definition of medical necessity.

Under the UBH Guidelines, a member of the Plan may be admitted to residential treatment only to the extent that the "why now" factors—that is, the "changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning" that "precipitated admission"—cannot be "safely, efficiently, and effectively treated in a less intensive level of care." (AR 1852.) Thus, it appears that under the UBH Guidelines, even if a member's underlying condition will not improve without residential treatment, such treatment is not authorized unless the treatment is necessary to address the "why now" factors—the particular "changes" or symptoms that "precipitated admission." It is largely this feature of the guidelines that led one court to conclude that the UBH Guidelines were arbitrary and capricious in themselves. *Wit v. United Behavioral Health*, 2019 WL 1033730, at *22 (N.D. Cal. Mar. 5 2019) (finding that the UBH Guidelines show "an excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions.")

By contrast, under the Plan's definition of "medical necessity," the inquiry is focused on what is necessary to treat a patient's *underlying condition*. For example, services are medically necessary under the Plan if they are "considered effective for your *illness, injury, or disease*"; if "Your *condition* would be adversely affected if the services were not provided"; and if they are "required for the direct care, treatment, or management of that *condition*." (AR 173.) There is no indication whatsoever that the concept of medical necessity limits coverage for a particular type of treatment, such as residential mental health treatment, to only those aspects of a patient's condition that are "why-now" factors—that is, those acute manifestations of the condition that precipitated admission. The introduction by the UBH Guidelines of this novel limitation on

coverage exceeds the discretion granted to Oxford under the terms of the Plan. It represents a new requirement for coverage, rather than an elaboration on the definition of medical necessity set forth in the Plan; only the latter is contemplated by the terms of the Plan.

Each of the denials issued by Oxford explicitly rely on the UBH Guidelines. (*See, e.g.*, AR 1395 ("I based this decision on clinical information provided and UBH Level of Care Guidelines for Mental Health Residential Treatment Center."); *see also* AR 288, 711.) While none of the letters explaining UBH's decision, nor UBH's notes, specifically identify Plaintiff's "why now" factors, they nonetheless reflect the general bias of the UBH Guidelines toward crisis management—that is, addressing acute symptoms—rather than the effective and otherwise medically necessary treatment of the underlying condition. Neither UBH's decision letters nor UBH's notes are responsive to Avalon's concerns about the likely ineffectiveness of treating Plaintiff's underlying eating disorder at lower levels of care. Instead, as detailed further below, to the extent UBH's reasons were accurate and relevant, UBH's inquiry seems to have been focused on the stabilization of Plaintiff's acute symptoms (*see, e.g.*, AR 1834 (noting that Plaintiff "is medically stable"); AR 1837 (same)), Plaintiff's immediate safety (*see, e.g.*, AR 488 ("Your child does not appear to be at risk of harming yourself or others.")); and addressing (at least partially) Plaintiff's recent weight loss, which appears to have precipitated Plaintiff's admission (AR 520 (indicating that Plaintiff dropped down from intensive outpatient to outpatient care around Thanksgiving of 2014, weighed as much as 113 pounds, but then her weight steadily decreased to around 104 pounds in the time period leading up to her admission to Avalon); AR 288, 711 (justifying Oxford's denial of care in part because of Plaintiff's weight gain)). This is not the same as asking whether residential treatment was medically necessary to effectively treat Plaintiff's

underlying eating disorder, and it is the latter inquiry that was required by the Plan. I find that Oxford's evident failure to conduct such an inquiry was arbitrary and capricious.

## 2. Oxford's Rationale for Denying Coverage

Oxford issued three decisions, by three different reviewers, denying Plaintiff's residential treatment from February 27, 2015 onward—an initial adverse benefit determination issued on March 2 by Dr. Becker, a March 4 denial of Plaintiff's first-level appeal by Dr. Kwon, and an August 5 denial of Plaintiff's second-level appeal by Dr. Fischer.[9] I address the three decisions together, as the differences between them are slight. All three decisions suffer from the same defects, and for the reasons that follow, I find that they represent an abuse of the discretionary authority granted to Oxford under the Plan.

UBH's explanations of its decisions consist of statements that are largely conclusory, unsupported, or of limited relevance to the medical necessity inquiry. All three decisions note that Plaintiff was cooperative with her treatment. Dr. Becker's initial determination states, for example, that Plaintiff has been "attending programming and following her meal plan." (AR 288.) Similarly, Dr. Kwon's March 4 decision noted that Plaintiff "is able to work on her recovery" and that she seemed to be "working well with others on her recovery goals." (AR 1395.) For one, the evidence does not support an unqualified conclusion that Plaintiff was cooperative with her treatment. For example, according to UBH's records, Avalon reported that Plaintiff took "small slow bites, watching others, refuses dessert and needed supplement, [and] needs constant reminders to complete her meals and t[o] not wipe or eliminate parts of the food." (AR 1831-32.) Avalon also reported that Plaintiff was taking "about 30 [minutes] to finish a meal and require[d] constant redirection." (AR 1831.) Upon redirection, Plaintiff "gets very mad and yells at staff."

---

[9] The relevant text of each letter is provided in Sections II.E, II.F, and II.G.

(*Id.*)  Thus, to the extent that Plaintiff was completing her meal plan, she was doing so grudgingly and only as a result of significant efforts on the part of Avalon's staff, who supervised Plaintiff's every meal and snack.  Avalon's notes from March 6 also indicate that Plaintiff "has been unwilling to move past her resentment toward Avalon and her parents for her being in treatment. She has spent every therapy session wanting to complain about the food, the fact that she has to replace for replaced [sic] food, etc.  Therapy has not been productive, but this is reflective of her mindset."  (AR 541.)  At one therapy session on March 6, Avalon's notes indicate that Plaintiff "was practicing avoidance by disengaging from the session.  She was laying on the couch with her face in a pillow and her eyes shut. . . .  [She] remains precontemplative and resistant to change." (AR 511.)  Avalon's notes from a March 2 therapy session indicate that Plaintiff continued to maintain that her eating disorder was "no big deal."  (AR 513.)  Avalon further noted that Plaintiff "attempts to deflect any discussions related to her eating disorder, and tries to talk about unrelated, superficial topics."  (*Id.*)  "She can be redirected," the note continues, "but it is clear that she does not want to talk about the real reason she is in treatment because she is avoidant of having to take responsibility and admit that there is a problem."  (*Id.*)   Avalon's notes from a February 23 individual therapy session indicate that Plaintiff "has poor awareness of the magnitude of her eating disorder" and "sees her team and treatment as the problem."  (AR 515.)  Numerous notations such as these preclude any conclusion that Plaintiff was fully cooperative with her treatment.  On the record before the Court, Plaintiff was, at most, only partially cooperative.

More importantly, it is not clear how the fact that Plaintiff was partially cooperative with her treatment supports the conclusion that residential care is no longer medically necessary to treat Plaintiff's eating disorder.  Under the APA Guidelines, which are part of the administrative record

and provide relevant criteria under the Plan,[10] cooperativeness speaks to Plaintiff's motivation to recover, one of the criteria for determining the appropriate level of care. (AR 608.) But the APA Guidelines include being "cooperative with highly structured treatment" as an indication that residential treatment is *appropriate*. (*Id.*) If Plaintiff were not cooperative with treatment, according to the APA Guidelines, inpatient hospitalization—a higher level of care—would be indicated. (*Id.*)

Moreover, Plaintiff's overall motivation to recover—the issue to which cooperativeness speaks—was poor. Avalon reported that Plaintiff "minimizes everything" and was annoyed to be in treatment. (AR 1831.) Avalon also told UBH that Plaintiff was "going through the motions" and "at times is sleeping during groups and not fully engaged." (*Id.*) Avalon's treatment plan, dated March 6, 2015, four days after Dr. Becker's initial adverse determination, indicates that Plaintiff "denies that there is a problem," that she "will be unable to begin the recovery process until she can admit that there is a problem and she is willing to try to change," that "for the past three weeks, [she] has been unable to move past her resentment toward Avalon and her parents for her being in treatment," and that "[t]herapy has not been productive, but is reflective of her

---

[10] The APA guidelines were submitted to Oxford as part of the Second Level Appeal, and thus constitute part of the administrative record. Although the APA Guidelines are not binding on Oxford, they provide relevant criteria under the Plan, which provides that medically necessary services are defined, in part, as those services that "are provided in accordance with generally-accepted standards of medical practice," and that Oxford "may base [its] decision on a review of: . . . medical opinions of a professional society . . .; reports and guidelines published by nationally-recognized health care organizations . . .; [and] professional standards of safety and effectiveness, which are generally recognized in the United States for diagnosis, care, or treatment . . . ." (AR 173.) Further, as noted above, the APA Guidelines specifically address the treatment of eating disorders, unlike the UBH Guidelines, which address the treatment of all types of mental illnesses. The Court considers the APA Guidelines in the analysis of whether Oxford's decision was arbitrary and capricious, bearing in mind both that Oxford was not bound to adhere to professional guidelines such as these, and that they are the only detailed formulation of "generally-accepted standards of medical practice" in the administrative record that specifically address the level of care needed to treat Plaintiff's condition.

mindset." (AR 541.) Under the APA Guidelines, "poor-to-fair motivation" is an indication for residential treatment, while "partial motivation" is an indication for partial hospitalization. (AR 608.) The only conclusion with support in the record is that Plaintiff's motivation was "poor-to-fair," and the more likely conclusion is that it was closer to "poor" than "fair."

Similarly, the APA guidelines note that the need for supervision at all meals to prevent the restriction of eating is an indicator for residential treatment. (*Id.*) The mere fact that supervision at all meals succeeds in eliminating or limiting restricting behaviors during those meals thus does not appear, in itself, to be an indication that a reduction in the level of care is appropriate. In short, the fact that Plaintiff was somewhat cooperative with her meal plan and her treatment more generally does not lend support to the conclusion that residential treatment was no longer medically necessary to treat Plaintiff's underlying eating disorder.

Both Dr. Becker's initial denial and Dr. Fischer's second-level appeal denial also note that Plaintiff was able to complete her daily activities and tasks. (AR 288; AR 711.) These statements appear to refer to Plaintiff's physical ability to attend therapy and other programming and to attend to her own personal hygiene. These observations are supported by the record, but they do little to support the conclusion that residential treatment was not medically necessary. The relevant inquiry under the terms of the Plan is whether the service in question is required for the effective treatment of Plaintiff's condition; the extent to which Plaintiff needed assistance with caring for her personal needs is at best tangential to this inquiry. For this reason, the APA Guidelines do not include the ability to care for oneself or engage in daily tasks as one of the ten criteria that determine the recommended level of care. (AR 607-09.) These observations seem, instead, to be a reference to the UBH Guidelines, which list "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is

endangered" as an example of an indicator that residential treatment is medically necessary. (AR 1852.) But the UBH guidelines apply to mental health disorders of all different types, and this indicator, which is given as an *example*, seems largely inapplicable to patients with eating disorders. Eating disorders do not generally affect a patient's ability to perform daily tasks such as personal hygiene and attending treatment programs—at least not until a patient has developed severe physical complications due to malnutrition, at which point inpatient hospitalization would likely be necessary. Moreover, as previously discussed, to the extent that the UBH Guidelines act to deny coverage for otherwise medically necessary residential treatment by limiting residential treatment to crisis management—such as when a patient is so malnourished as a result of her eating disorder that she can no longer attend to the tasks of daily living—the UBH Guidelines exceed the authority provided by the Plan to enact standards by fundamentally changing, rather than elaborating on, the definition of medical necessity. Further, there was never any indication that Plaintiff could not perform such daily activities, even during Plaintiff's first two weeks at Avalon, for which Oxford approved coverage. (*See, e.g.*, AR 519-25 (Plaintiff's intake assessment dated February 11, 2015).) The fact that she could perform "daily tasks" thus does not lend support to the conclusion that residential treatment was no longer medically necessary.

All three decisions also refer to the absence of behavioral and mood symptoms. For example, both Dr. Becker and Dr. Fischer's explain that Plaintiff was "not acting on every thought or feeling." (AR 287; AR 711.) Dr. Kwon's letter notes that Plaintiff "does not appear to have significant mood symptoms" and that "no behavioral disturbances are reported." (AR 1396.) These observations have little apparent connection to the nature of Plaintiff's condition. Nor did Plaintiff suffer from any such symptoms when she was initially admitted to Avalon and approved for coverage by UBH, with the exception of some degree of anxiety (AR 520). To the extent that

"behavioral disturbances" refers to eating disorder behaviors, Avalon reported that Plaintiff was "actively attempting to use eating disorder related behaviors at the table, even in the presence of staff members." (AR 492.) While the APA Guidelines indicate that the presence of "co-occurring disorders," such as substance use, depression, and anxiety, "may influence choice of level of care" (AP 608), the mere absence of significant co-occurring disorders does not, in itself, support moving the Plaintiff to a lower level of care. (*Id.*)

Dr. Becker and Dr. Fischer also explain that Plaintiff was able to attend several outings. (AR 288; AR 711.) But UBH's own notes from Dr. Becker's peer-review call with Avalon indicate that while Plaintiff did travel with the group on these outings, including a ski outing, she was not able to participate in the actual activity, because Avalon did not feel she was medically ready. (AR 1833.) According to Avalon's notes, Avalon told Dr. Becker that the ski outing "was basically going for a ride, as we do not feel she is medically ready for the activity." (AR 494.) Likewise, UBH's notes from the call indicate that Avalon reported that while she did attend an outing for a "[Z]umba class," she did not participate meaningfully and was "just walking." (AR 1833.) The ability to do little more than go for a ride and walk seems largely irrelevant to the appropriate level of care for Plaintiff's eating disorder, and using this fact to explain the denial of coverage for Plaintiff's residential treatment is misleading in light of Avalon's explanation.[11]

---

[11] Oxford's reliance on Plaintiff's "outings" to support its denial of coverage, even though UBH's records indicate that UBH's reviewers were aware of the nature of these outings, lends some support to Plaintiff's argument that the structural conflict of interest created by the fact that Oxford both administered and funded the Plan affected Oxford's decision-making, and should thus be weighed "as a factor in determining whether there is an abuse of discretion." *Roganti v. Metropolitan Life Ins. Co.*, 786 F.3d 201, 217 (2d Cir. 2015) (citations internal quotation marks omitted). Indirect evidence *can* support a finding that a conflict affected a plan administrator's decision. *Id.* at 218 ("[U]nder certain circumstances, an irrational decision or a one-sided decision-making process can alone constitute sufficient evidence that the administrator's conflict of interest actually affected the challenged decision."). Because I find that Oxford abused its discretion

Dr. Kwon also wrote that Plaintiff "does not appear to be at risk of harming yourself or others." (AR 1395.) Similarly, Dr. Fischer wrote that Plaintiff "could keep herself safe." (AR 711.) But if Plaintiff were homicidal or suicidal, *inpatient hospitalization*, and not residential treatment, would be indicated by both the APA Guidelines and UBH's own guidelines. (AR 607 (indicating that suicidality can be an indicator for "inpatient monitoring and treatment"); AR 1852 (indicating that the *absence* of "imminent or current risk of harm to self, other, and/or property" is a prerequisite for residential treatment).) The fact that Plaintiff was neither homicidal nor suicidal did not support moving Plaintiff from residential treatment to partial hospitalization.

Dr. Becker and Dr. Fischer's denials also state that "weight gain has occurred." (AR 288.) Plaintiff appears to have gained several pounds since her admission to Avalon. She weighed 101.4 pounds around the time of her admission and 106.2[12] pounds as of February 26—a gain of 4.8 pounds. According to the APA Guidelines, residential treatment is generally indicated when a patient is at less than 85% ideal body weight, while partial hospitalization is generally indicated when a patient is at greater than 80% ideal body weight. (AR 607.) According to UBH's notes, as of February 26, 2015, Plaintiff was at 92% ideal body weight (AR 1883), placing her above the 85% general threshold for residential treatment. Plaintiff's weight as of February 26, 2015 thus weighed in favor of a lower level of care.

The APA Guidelines repeatedly stress, however, that level of care decisions should not be made solely on the basis of weight criteria and that "[p]atients need to both gain healthy body weight *and learn to maintain that weight* prior to discharge." (AR 606 (emphasis added); *see also*

---

without giving weight to Oxford's conflict of interest, however, I need not decide how much weight to accord this factor.

[12] By the time of the peer-review call on February 27, Plaintiff's weight had dropped 0.6 pounds to 105.6 pounds. (AR 1833.)

AR 609 ("[P]atients should not be automatically discharged just because they have achieved a certain weight level unless all other factors are appropriately considered.").)  Here, there is no indication that Plaintiff had learned to overcome the eating disorder behaviors that prevented her from maintaining a healthy weight.  For example, Avalon noted that, "[e]ven with 24/7 monitoring, [Plaintiff] continues to try to use eating disorder behaviors without feeling the need to try to hide what she is doing."  And on February 27, 2015, Dr. Boghosian told Dr. Becker that Plaintiff "would relapse as soon as she went home if she returned at this point because she is not able to feed herself without the structure of this program."  (*Id.*)  Indeed, all evidence points to the conclusion that Plaintiff continued to deny that she even had a problem.  For example, she told Avalon that "she was happiest when she was at her thinnest and doesn't understand why Avalon will not let her be happy." (AR 540.)  Moreover, in approving Plaintiff's residential treatment from February 11-19, UBH noted that Plaintiff was at 88% ideal body weight (AR 1823), already above the 85% threshold in the APA Guidelines, indicating that UBH's reviewers also did not view the 85% benchmark as dispositive.  In short, the mere fact that Plaintiff gained 4.8 pounds since her admission is not, by itself, substantial evidence that residential treatment was not medically necessary to treat Plaintiff's eating disorder.

The remaining statements in the three letters explaining UBH's denial of coverage were either conclusory[13] or so vague[14] that they do not provide any meaningful support for UBH's denial.

---

[13] For example, Dr. Becker writes that Plaintiff "does not appear to have medical or mental health concerns needing 24-hour care" and "[it] appears treatment could continue in another setting." (AR 288.)  Dr. Kwon writes that "[t]he care your child is getting can happen in a less restrictive program."  (AR 1395.)

[14] For example, Dr. Becker writes that Plaintiff is "doing better."  (AR 288.)

In contrast to the reasons provided by UBH's reviewers, many of which were by turns of little relevance (such as the references to the absence of homicidal and suicidal ideation), conclusory, and even misleading (such as the references to Plaintiff's "outings"), Avalon's rationale for recommending continued treatment at the residential level of care spoke to the specific characteristics of Plaintiff's eating disorder and the relevant criteria for determining the appropriate level of care. Avalon was particularly concerned with Plaintiff's continued denial that her eating disorder was a problem and her evident lack of motivation to work on her recovery. (AR 494.) Avalon was also concerned with sending her home for treatment at a lower level of care when her mother also had an eating disorder, making the home environment less than ideal for recovery. (*Id.*) As noted, Dr. Boghosian opined that Plaintiff "would relapse as soon as she went home" because "she is not able to feed herself without the structure of this program."[15] (*Id.*) These concerns are rationally related to the appropriate level of care for treating Plaintiff's underlying eating disorder (as opposed to simply stabilizing the physiological complications resulting from malnourishment). They also correspond to "generally accepted standards of medical practice" and "professional standards of safety and effectiveness" (AR 173), as described in the APA Guidelines, which include "motivation to recover," "[s]tructure needed for eating/gaining weight," and "environmental stress" as relevant criteria for level of care determinations. (AR 608-09.) The same cannot be said for Oxford's reasoning.

The evaluation of psychiatric conditions without the benefit of examining a patient is particularly difficult, because "[u]nlike cardiologists or orthopedists, who can formulate medical

---

[15] Plaintiff had already been in residential treatment in 2014, once for two months and once for 40 days, and relapsed twice. (AR 518, 520.)

opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms." *Sheehan v. Metropolitan Life. Ins. Co.*, 368 F. Supp. 2d 228, 255 (S.D.N.Y. 2005). Nonetheless, in the ERISA context, there is no equivalent to the "treating physician rule" applied in Social Security benefits determinations, and "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Hobson*, 574 F.3d at 85 (same) (citing *Black & Decker Disability Plan*, 538 U.S. at 834). Plan administrators may not, however, "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, 538 U.S. at 834. Here, I find that it was arbitrary and capricious for Oxford to reject Avalon's well-reasoned, specific, and substantiated explanation for the necessity of residential treatment to treat Plaintiff's eating disorder, in favor of its own cursory analysis, much of which was of limited relevance to the standard of medical necessity set forth in the Plan.

**B. Scope of the Summary Judgment Record**

The parties disagree whether the materials Plaintiff submitted to Oxford after Oxford's August 6, 2015 denial of Plaintiff's second-level appeal constitute part of the administrative record. Plaintiff argues that neither Plaintiff nor her parents ever received the August 6 decision and that until Oxford notified Plaintiff of its final decision, the record remained opened. Oxford argues that it mailed the decision letter to Plaintiff's parents, and, in any case, any lack of notice did not prejudice Plaintiff. I need not resolve this dispute because I find that Oxford's denial of benefits was arbitrary and capricious on the record submitted to it on April 16, 2015 as part of Plaintiff's second-level appeal.

## C. Appropriate Remedy

Plaintiff urges the Court to reverse Oxford's coverage decision and order Oxford to reimburse Plaintiff for the cost of her treatment at Avalon. Under Second Circuit precedent, "where [a court] conclude[s] a plan administrator's finding was arbitrary and capricious, [it] will typically not substitute [its] own judgment, but rather will return the claim for reconsideration unless [it] concludes that there is no possible evidence that could support a denial of benefits." *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013) (internal quotation marks omitted). Because I cannot reach that conclusion here, remand is the appropriate remedy. On remand, Oxford is directed to reconsider the evidence, applying the appropriate definition of medical necessity, which, under the terms of the Plan, is not exclusively focused on the "why now" factors that precipitate admission, but rather on whether the services in question are necessary to effectively treat the underlying condition. Oxford's rationale for its decision on remand must be rationally related to whether residential treatment was necessary to treat Plaintiff's *eating disorder*, and not just manage her acute symptoms.

## VI. CONCLUSION

For the foregoing reasons, Oxford's motion for summary judgment is DENIED. Plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. The action is remanded to Oxford for further consideration consistent with this Order.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
           November 5, 2019